UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:06CR427 |
| | ) | |
| v. | ) | The Honorable James C. Cacheris |
| | ) | |
| ROBERT T. SCHOFIELD, | ) | |
| Defendant. | ) | |

### DEFENDANT'S BRIEF IN SUPPORT OF THE GOVERNMENT'S RULE 35 MOTION

Defendant, Robert T. Schofield, by and through his counsel, submits this Brief in support of the Government's motion, pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure and 28 United States Code §994(n) for a reduction of sentence based upon the Defendant's substantial assistance in the investigation and prosecution of others who have committed criminal offenses. In support of the motion, Defendant provides the following and seeks a sentence reduction of 60%:

I.   **Procedural History**

1.   The Government has noted that it initially moved for a reduction of sentence under Fed.R.Crim.P. 35(b) on April 16, 2008, requesting that the hearing be delayed to allow the cooperation to continue.

2.   At the time of the filing, the vast majority of the cooperation had not taken place, and yet, according to Mr. Schofield's recollection, there was already talk about a general sense

- 1 -

that 50% reduction was reasonable.

3. Indeed, Mr. Schofield's cooperation started even prior to his sentencing, before the government sought an upward departure from the sentencing guidelines. This case's history of the government seeking extraordinary cooperation, but undervaluing it in the context of sentencing, began almost at the time the case was brought.

## II. The Scope and Specifics of Mr. Schofield's Substantial Assistance

4. In the 5½ years since Mr. Schofield pleaded guilty, he has completely committed himself to rectifying his wrongs and fulfilling his part of the cooperation agreement. The scope, extent, and specifics of Mr. Schofield's efforts to correct his misdeeds are extraordinary:

- Mr. Schofield's initial cooperation began immediately following his guilty plea and continued for nearly five (5) months until his sentencing. During that time he was debriefed repeatedly by FBI and DHS OIG Agents. After sentencing, he was retained in Alexandria for several weeks while the debriefing continued. Notably, no agents from State Department or CIS participated in the debriefing at this stage.

- The cooperation continued and increased significantly after sentencing.

- Mr. Schofield testified twice for the government, with both cases resulting in convictions. In the first case the defendant had had his bail revoked for threatening witnesses, and in the second the defendant was a law enforcement officer. Nevertheless, Mr. Schofield testified voluntarily both times.

- Mr. Schofield was transported back to Alexandria by the U.S. Marshals four times in the last six years. In each case he was returned to provide testimony and/or cooperation. Twice, his testimony was cancelled due to guilty pleas.

- Mr. Schofield attended debriefings with federal agents on more than 50 days and over the course of 200 hours. He was made available to seven different government agencies or offices.

- Much of the cooperation revolved around Mr. Schofield's own crimes, but significant portions of the debriefing were unrelated to his criminality. Two examples of the type of information requested of him – beyond the many inquiries regarding his own actions – demonstrate his high level of cooperation. In one

instance, CIS asked him to review their security measures and comment on their reliability. Much of this discussion was unrelated to his crime. In another instance, the US Department of Labor sought his input regarding issues with corrupt attorneys and falsified labor certifications in both the Washington, DC and Baltimore areas—again, these issues were unrelated to the specifics of his crime.

- Through the efforts of counsel, upon the request of the US Attorney's Office, Mr. Schofield voluntarily and fully complied with the forfeiture order of the Court. This included delivering vehicles to Marshals Service, arranging the transfer of funds from bank accounts in Hong Kong and the Philippines, and the transfer of Mr. Schofield's Thrift Savings Plan account, all without the need for the Government to expend significant resources.

- At the highly unusual request of CIS, Mr. Schofield filmed a lengthy interview, which became part of an impactful employee training video used in employee ethics training. In the video he speaks about what motivated him, what failings in the system allowed him to get away with his crimes, how he has dealt with his punishment, and how he believes the system could be changed to prevent future fraud. A copy of the interview has been produced to the Court by the government and is a stunning example of the scope of the assistance Mr. Schofield has been willing to provide, even at the expense of personal embarrassment. Attached to these papers for the Court's convenience as **Exhibit 1**, are the questions that were propounded to Mr. Schofield by the interviewer.

- At the request of ICE agents, Mr. Schofield provided over 30 pages of handwritten notes concerning security issues and his co-conspirators.

- Mr. Schofield responded to more than ten mail requests for information from both the FBI and ICE, as well as over 50 email requests from ICE to assist with their investigations. As recently as September 4, 2012, he has been called upon by ICE to comment on how certain investigations might be conducted.

- Mr. Schofield has committed to continuing to cooperate and being available at the government's request after the completion of his sentence. He has stated this to the US Attorney and the various agents with whom he has dealt. As these individuals know, all the government needs to do is to ask, and he will provide assistance or testify.

5.      While the agents who debriefed Mr. Schofield all were upset with him for the harm that he caused, they have developed a high degree of respect for Mr. Schofield's knowledge. Mr. Schofield demonstrated a nearly photographic memory for the details of nearly all of the individuals with whom he dealt. He was completely honest with the agents, never

attempting to minimize his involvement. So even though he had committed these crimes, the agents have come to rely on Mr. Schofield for accurate information, and also sought his recommendations on the steps to take to prevent future crimes of this nature.

6. The government's reference to the boxes of files secured in a "location that had not been searched" is misleading. The boxes in question were not secreted by Mr. Schofield in an effort to hide them from the government. To the contrary, they were easily identifiable as government-issued file storage boxes and were located in a car parked in the attached garage of Mr. Schofield's home. The government "thoroughly" searched that residence on the date of Mr. Schofield's arrest and simply overlooked them.

7. Ironically, it was those very boxes – the existence of which was voluntarily disclosed by Mr. Schofield shortly after he began his cooperation so they could be turned over to the Government – which facilitated his substantial cooperation and allowed the government to understand the scope of the illegality. Although the boxes were never sequestered in the manner the government suggests (they were simply missed by the agents who searched Mr. Schofield's home), they most likely would not have been found had Mr. Schofield not voluntarily disclosed their existence and arranged for their delivery to the Government. They are yet one more example of his willingness to cooperate and atone for his actions.

### III. The Agencies' Failure to Act in a Timely Fashion Exacerbated the Problems About Which They Now Complain.

8. Immediately after entering his guilty plea on November 30, 2006, the FBI and OIG began reviewing immigration files with Mr. Schofield and debriefing him at the Alexandria Detention Center. Mr. Schofield provided in depth information concerning individual files,

describing his involvement with each of the individuals in the files and their family members. The FBI and OIG interviews continued through Mr. Schofield's sentencing on April 23, 2006.

9. Neither CIS nor ICE attempted to interview Mr. Schofield while he was detained in the Alexandria Detention Center from his arrest in late June 2006 until he was remanded to the Bureau of Prisons in June 2007.

10. After Mr. Schofield was transferred to FCI Elkton, the FBI remained in contact with Mr. Schofield through counsel while they continued their investigation. Questions concerning various individuals or issues would be sent to counsel and counsel would relay them to Mr. Schofield who would promptly and thoroughly address them and send them back to counsel to be given to the FBI.

11. In the fall of 2007, Schofield was interviewed at FCI Elkton regarding correcting security problems. He was also questioned about other CIS personnel to determine if any were involved with Mr. Schofield. No individuals or immigration files were reviewed or discussed.

12. In December 2007, Mr. Schofield was returned to Alexandria and testified in the Lloyd Miner case. While in Alexandria, Mr. Schofield was interviewed by the FBI and the U. S. Attorney's Office. But during the approximately 11 weeks that Mr. Schofield was in Virginia, neither CIS nor ICE interviewed him.

13. In 2008, while at FCI Elkton, Mr. Schofield was interviewed for the anti-fraud video prepared for CIS personnel. Mr. Schofield was very candid in the interview regarding his activities and the harm it caused. (The Court has been given a copy of the interview by the government.) Neither CIS nor ICE interviewed him regarding the immigration files when they

were present to film the video.

14. Finally, in July 2010, Mr. Schofield was again brought back to the Alexandria Detention Center where ICE began debriefing him regarding the immigration files and other matters. Mr. Schofield's stay was extended for ten weeks because, as he had been with the FBI and OIG, he was completely candid and forthcoming with information. He provided detailed information for each immigration file; he provided detailed steps to be taken to identify additional recipients of benefits; he provided information on the manner in which he was able to circumvent the process; and he provided steps to be taken to correct the process and to prevent this happening in the future. The interviews lasted 6-8 hours a day for more than 50 days and went into the month of September. Between interview sessions, Mr. Schofield prepared notes on various topics in response to questions propounded to him by the agents during the interviews.

15. Critically, CIS attended fewer than 10 of those July to September debriefings.

16. In April 2011, Mr. Schofield was again brought back to Virginia where he spent four weeks, during which time neither ICE nor CIS interviewed him.

17. The government points to the difference between what Emilio Gonzalez, then Director of CIS, predicted would be the impact on the agency, and what current Director Alejandro N. Mayorkas states the impact has been, as well as the impact on the State Department which has had to remove a large number of passports. However, the agencies themselves must shoulder a large part of the blame because of their slow response to the potential problems they would be facing.

18. As pointed out by Director Mayorkas, it was not until April 2010 that CIS, ICE

and the State Department organized a task force to review the immigration files and debrief Mr. Schofield. By that time, the FBI and the OIG had been interviewing Mr. Schofield for over three years and had nearly completed their investigation. It was an additional three months – in July 2010 – before the other agencies' task force began to debrief Mr. Schofield.

19. Mr. Schofield had been available for over three years to these agencies to be debriefed, to assist in the investigation of the immigration files and to repair of the damage he had caused. Had CIS, ICE and the State Department began their investigation in a timely manner, the harm caused by the derivative status of dependents of those individuals who received illegal benefits from Mr. Schofield, and the passport issues which the government is now concerned about, would have been minimized.

20. Throughout the same time period, Mr. Schofield repeatedly suggested to the FBI and OIG that he do file-by-file reviews to help contain the damage. Despite this, three years elapsed before ICE or CIS began that process.

21. While the damage caused by Mr. Schofield's actions cannot and should not be minimized, Michael Maxwell, the former Director of the Office of Security and Investigations for CIS, in his testimony before a Congressional subcommittee pointed out that the problems within the CIS system were systemic and encompassed the entire agency. Although he used Mr. Schofield as an example of internal fraud, he noted the harm caused by Mr. Schofield was only a small part of the problems which CIS was facing. (A portion of Michael Maxwell's testimony before the House of Representative's Subcommittee on Immigration, Border Security and Claims detailing the problems within CIS which had plagued CIS for many years is attached here to as **Exhibit 2.**)

22. Mr. Schofield does not dispute that by illegally issuing naturalization certificates he caused serious harm to the government, the system, and the many people waiting to receive such benefits lawfully. He is deeply remorseful for his actions. The fact remains, however, that the vast majority of the illegally granted benefits – approximately 175 individuals – were granted to aliens who were already lawfully in the country as legal permanent residents, and had passed background checks. For the most part, the alien sworn in as a citizen had earned the privileges of citizenship, but were fearful of the inability to pass the exam or unable to pass the language proficiency requirement. They were not individuals who had illegally entered the country and had no legal status; they were in a legal immigrant status when they obtained their naturalization certificates. While this does not minimize the scope of Mr. Schofield's wrong-doing, it is a stark counterpoint to the allegations made in Mr. Mayorkas' May 2012 letter.

23. Without minimizing the effect that Mr. Schofield's criminality had on the immigration system – a situation that Mr. Schofield has been fully and completely willing to try to undo as he accepts the punishment imposed by this Court – this Court should not be swayed by the self-serving statements of a dysfunctional CIS, when that very agency sat on its hands for over three years while Mr. Schofield demonstrated his willingness to assist in the clean-up with any agency that sought his assistance.

24. CIS's ineptitude is further demonstrated by the fact that, although Mr. Schofield taped the employee training video for and at the request of CIS, that video, which is perhaps the best example of the highly-unusual level and type of assistance he has provided, is not even mentioned in Director Mayorkas' May 16, 2012 letter. It is telling that the agency omitted that aspect of Mr. Schofield's unique willingness to assist them in resolving the harm he caused.

IV.     **Throughout the course of Mr. Schofield's cooperation, an expectation by defense counsel that the possibility of at least a reduction of 50% existed; it is believed that a lower recommendation was made due to political pressure from two agencies.**

25.     The government's recommendation of 33% is significantly below the expectation formed by defense counsel over the last six years in which the substantial assistance has been provided. Throughout his cooperation – which began immediately after his guilty plea – Mr. Schofield has been told by every agency with which he's dealt, including the US Attorney, FBI, ICE, CIS, and the State Department, how helpful he has been to their efforts, and how appreciative they have been of his willingness to answer their questions – including those that related to matters entirely beyond the scope of his criminality.

26.     While it is, of course, the US Attorney's prerogative to make a recommendation at a level below what would be typical, it is submitted that the instant recommendation has likely been affected by the political influence of the very agencies which failed to take any steps to accept Mr. Schofield's efforts to undo his wrongs for over three years.

27.     That these agencies should be given an opportunity to weigh in on this issue is not disputed. However, when law enforcement agencies (1) delay the process in a manner that usurps the Court's discretion to resentence a defendant in a manner it sees fit (defense counsel initially intended to seek a reduction of 70%, See, **Exhibit 3**, Letter from A. Yamamoto to R. Walutes, dated November 14, 2011), and (2) pressure the US Attorney's Office in a manner that affects the government's right to recommend substantial reductions of sentence for substantial cooperation, the agencies' roles should be limited by the Court. Agencies should not be able to alter the basic intention and public policy behind Rule 35: that defendants who provide substantial assistance can receive substantial reductions in their sentences for doing so.

28. The Court should utilize its discretion to strip this case of politics and impose a sentence reduction commensurate with the substantial assistance Mr. Schofield has provided.

### V. Mr. Schofield has had an Exceptionally Positive Record During his Incarceration and Plans to Care for his Elderly Father Upon Release

29. Mr. Schofield has accepted his punishment with seriousness and humility by becoming a positive influence in each of the facilities in which he has been incarcerated. He has used his time wisely by helping others and by improving himself through study.

30. Examples of his positive institutional record include:

- Mr. Schofield volunteered to teach GED support classes at both Alexandria Detention Center and FCI Elkton. At Elkton, it became his BOP-assigned job upon arrival.

- Under the auspices of the BOP Education Department at Elkton, he developed a curriculum and taught a course for inmates on preparing for college.

- He completed several BOP-sponsored courses including the Threshold Program—a BOP course in spiritual self-development and life decisions—and Kent State University's Entrepreneurship certificate course.

- Mr. Schofield wrote and submitted two programs for consideration by BOP administrators. The first was to allow inmates to volunteer for healthcare positions at the various BOP medical facilities across the country. The program would enable inmates to make their incarceration meaningful, while acquiring skills for healthcare employment post release. The second program was to enable inmates to donate a portion of their earnings to BOP-selected charities, similar to the Combined Federal Campaign. The intent of both programs was to empower inmates to be productive members of society while still incarcerated.

31. Mr. Schofield not only regrets his crime but understands the need to live the rest of his life in a more productive manner. To that end, he has asked the BOP authorize his future release to Florida instead of Virginia, so that he may become a caretaker for his elderly father.

32.     Aside from the consequences his crimes have had on innocent persons, the death of his mother in 2008, while he was incarcerated, has been the hardest single thing for him to forgive himself for.  He was unable to assist in her care during her debilitating illness (ALS), and he feels an overwhelming need to be present to assist his father with his medical issues. Since March 2010, his father has suffered a major heart attack, implantation of a pacemaker, and two subsequent hospitalizations for related infections and illnesses. His father is currently living alone and Mr. Schofield wishes to join him in Florida as soon as possible. See, **Exhibit 4**, Letter from Robert Schofield to Hon. James Cacheris, July 18, 2012.

## VI.     The Appropriate Reduction for Mr. Schofield's Substantial Assistance to the Government Should Be Greater Than 50%.

33.     The appropriate sentence for Mr. Schofield's crimes was imposed long ago at sentencing.  The question now before the Court is what is the appropriate reduction for Mr. Schofield based on the breadth, depth, and value of Mr. Schofield's substantial assistance to the government?

34.     There is no question that Mr. Schofield's substantial assistance far exceeds that of the average individual who has cooperated with the government.  The breadth and scope of Mr. Schofield's cooperation and rehabilitation is truly extraordinary.

35.     In fact, there is no dispute that Mr. Schofield's cooperation has been extraordinary – the government's own filing points that out.  Yet the recommended reduction is only 33%. Unfortunately, as noted above, it appears that politics have entered into Mr. Schofield's case. There can be no other explanation for a recommendation of only 33% in light of the extraordinary substantial assistance that Mr. Schofield has provided.

36. A key theme of the government's position is that the need for deterrence of others justifies the recommended reduction of only 33%. However, under the law and policy surrounding Rule 35, Mr. Schofield's reduction should be based only on the scope of his extraordinary substantial assistance and his rehabilitative efforts, not on a need to deter others, which was fully taken into account when this Court sentenced Mr. Schofield initially.

37. Moreover, a reduction of 50% or greater would avoid an unwarranted disparity in sentencing between Mr. Schofield and his partner and co-conspirator Yuhua Ren, a/k/a Eva Zhang. Ms. Ren worked hand-in-hand with Mr. Schofield and brokered over 50% of the immigration cases involved in this case. While Ms. Ren was attributed with between $1 million and $2.5 million and had a $1.6 million judgment entered against her, the government felt that Ms. Ren, who charged her wealthy clients from $90,000 to $120,000 per transaction, made between $36 million and $48 million as a result of her criminality.

38. Ms. Ren received a 50% reduction in her sentence, from 87 months to approximately 44 months, for her cooperation even though the government expressed concerns about her truthfulness. The extent of Ms. Ren's cooperation was substantially less than Mr. Schofield's, consisting merely of testifying in one or two of the government's cases. As pointed out by the government in its pleadings and in this pleading, Mr. Schofield's cooperation has far exceeded Ms. Ren's cooperation. Not only did he testify in two trials, he was available to testify in a dozen more cases. He has been a powerful, voluntary witness for the government, and his detailed knowledge ultimately provided the impetus for the defendants in the other cases to enter guilty pleas.

39. Mr. Schofield should receive the full benefit of the extraordinary substantial

assistance that he has provided. The government's mantra when seeking the cooperation of defendant's has always been, "The more cooperation you can provide, the greater the reduction you will receive." For the government to seek a reduction of 33% for Mr. Schofield in the face of his efforts, when his co-defendant Yuhua Ren received a 50% reduction for substantially less cooperation, is totally contradictory and sends the wrong message. It sends the message that a reduction is not going to be based on the extent of cooperation provided, but on the politics and goodwill of the agencies affected.

40. A letter from Mr. Schofield to the Court is also attached for the Court's consideration. See, **Exhibit 5**, Letter from Robert T. Schofield, Jr. to Hon. James Cacheris, July 15, 2012.

41. For these reasons, Mr. Schofield asks the Court to take into consideration the extent of his extraordinary cooperation and reduce his sentence by 60%.

                Respectfully submitted,

                ROBERT T. SCHOFIELD
                By Counsel

                /s/
                J. FREDERICK SINCLAIR
                Virginia State Bar # 08073
                Counsel for Robert T. Schofield
                100 North Pitt Street, Suite 200
                Alexandria, VA 22314
                703-299-0600

/s/
ALAN H. YAMAMOTO
Virginia State Bar # 25872
Counsel for Robert T. Schofield
643 South Washington Street
Alexandria, VA 22314
703-684-4700

ROBERT T. SCHOFIELD, IV
New York Bar Reg. #2802148
Counsel for Robert T. Schofield
Pro Hac Vice
One Commerce Plaza, Ste. 1900
Albany, New York 12260
518-487-7616

CERTIFICATE OF SERVICE

    I certify that on the 21st day of September 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

    Ronald L. Walutes, Jr., Esquire
    U.S. Attorney's Office
    2100 Jamieson Avenue
    Alexandria, VA  22314,

and emailed to:

    Karen Moran
    U.S. Probation Office
    401 Courthouse Square
    Alexandria, Virginia

                                            /s/
                                 Alan H. Yamamoto
                                 Virginia Bar No. 25872
                                 Attorney for Robert Schofield
                                 643 S. Washington Street
                                 Alexandria, Virginia  22314
                                 703-684-4700