# Exhibit 2

Testimony of

# MICHAEL J. MAXWELL

on

# Whether Attempted Implementation of the Senate Immigration Bill Will Result in an Administrative and National Security Nightmare

before

**The Subcommittee on Immigration, Border Security, and Claims**

**Committee on the Judiciary**

**U.S. HOUSE OF REPRESENTATIVES**

**Thursday, July 27, 2006**

*National Security Nightmare*

Mr. Chairman and Members of the Subcommittee,

I am pleased to be here today to discuss the impact that implementation of S. 2611 by US Citizenship and Immigration Services (USCIS) would have on national security. As the former Director of the Office of Security and Investigations (OSI), the only law enforcement component within USCIS, I must point out that the basic premise of this hearing—that implementation of S. 2611 could *create* an administrative and national security nightmare—is faulty. The fact is that an administrative and national security nightmare *already exists* at USCIS under our current immigration policy. Implementation of the Senate bill would codify the nightmare and ensure that the criminals, terrorists, and foreign intelligence operatives who have already gamed our immigration system are issued legal immigration documents and allowed to stay permanently.

Asking USCIS to implement a proposal as sweeping as S. 2611 without first addressing the existing national security vulnerabilities in our immigration system would be irresponsible, at best, and could actually facilitate ongoing criminal enterprises. I also agree with Director Gonzalez who, on at least three occasions, has stated that it would be impossible for USCIS to implement the Senate bill within the prescribed time frame. The agency has neither the personnel nor the infrastructure to process an additional 10 to 20 million applications. I would go one step further and suggest that USCIS could never implement S. 2611 without fully compromising national security. The entire underlying immigration system is simply too flawed.

Doctor Gonzalez was warned by me, and by others, both prior to his confirmation as Director and immediately following, that USCIS is a vipers nest of career federal employees willing to cover up faults in the system to advance their careers, to obstruct ranking political appointees—including the previous Director—at the cost of national security, and to institute policies, programs, and systems independent of Headquarters and Administration direction for their own gain. Since I last briefed this subcommittee in September of 2005, nothing has changed. In fact, recent news from USCIS only verifies the fact that we are seeing the beginning of the convergence I predicted at that briefing: the perfect immigration storm.

## Building on a Faulty Foundation

Our current immigration system is broken. On this statement there is virtually universal agreement, even among administration officials:

- During his October 18, 2005 testimony before the Senate Judiciary Committee, DHS Secretary Michael Chertoff stated, "we recognize that the current [immigration] situation is in desperate need of repair." He went on to acknowledge, "Parts of the system have nearly collapsed under the weight of numbers."

- At an April 5, 2006, press conference to announce the creation of task forces to combat immigration and document fraud, Assistant Secretary for Immigration and Customs Enforcement (ICE) Julie Myers pointed out that terrorists have used legal immigration channels like asylum to embed in American society. She noted that "each year tens of thousands of applications for immigration benefits are denied because of fraud, and those are just the ones we find.

- On April 13, 2006, Janice Sposato, head of the newly created National Security and Records Verification Directorate at USCIS, was quoted in a UPI article as saying that USCIS adjudicators sometimes find themselves in a "difficult and ambiguous legal situation" when trying to weed out those who might pose a terrorist threat. "I'm not going to tell you I have all the tools I need" to deny citizenship and other immigration benefits to potential terrorists, she acknowledged.

- On June 11, 2006, ICE posted the following on its website:

    "ICE also participates in the interagency **Identity & Benefits Fraud Task Force**, which seeks to restore integrity to the immigration process and prevent terrorists and criminals from entering the United States. . . . **Operation Integrity** is a new **Identity & Benefits Fraud** Unit initiative to restore integrity to the immigration system and to address vulnerabilities in the system that terrorist or criminal organizations could exploit to gain entry to the country. Operation Integrity will support a nationwide system of "IBF Task Forces" to detect, deter, and disrupt criminal and terrorist organizations that attempt to exploit the immigration system"

- On June 20, Karl Rove told the National Federation of Independent Business "immigration is turning into a big problem. The more you look at it, the more clear it is that every single part of the system is broken."

    Here are just a few examples to support Mr. Rove's critical assessment:

- The DHS Inspector General recently reported that, from 2001 through the first half of 2005, 45,000 high risk aliens from state sponsors of terrorism and special interest countries have been released into American communities because of the inability of DHS to conduct a thorough background check on aliens.[1]

- An internal USCIS document reveals a backlog, as of late September 2005, of more than 41,000 immigration applications with IBIS hits requiring further investigation.[2]

- Senior-level USCIS staff have information indicating that suspected terrorists have established bogus educational institutions in multiple U.S. communities and used the student visa program to move recruits into the United States.

---

[1] Attachment 1: *Detention and Removal of Illegal Aliens*, OIG-06-03, Office of the Inspector General, Department of Homeland Security, April 2006, p. 10.
[2] Attachment 2: "Draft—10/4/05 Initial Statement," p. 2.

- Recent USCIS immigration fraud assessments indicate that the incidence of fraud in some visa categories is as high as 33 percent.[3]
- Since 2004, at least 17 reports by the GAO and DHS OIG have revealed critical flaws in the way USCIS implements the immigration process. Annual reports by the Citizenship and Immigration Services Ombudsman identify additional problems.

Virtually every part of our immigration system is broken and needs to be reengineered. But there are three overarching issues that, in my professional view, must be addressed before any policy reforms can be effective. They are:

1. Rampant internal corruption;
2. A customer-service mentality that, despite vocal public denials by appointed official, invariably trumps national security concerns; and
3. A failure or refusal to share critical national security information even among the different component-agencies of the Department of Homeland Security (DHS), let alone with outside law enforcement or intelligence agencies.

Any one of these, individually, presents an opportunity for criminals, terrorists and foreign intelligence services to do this nation grave harm. Combined, these three issues present policy makers, law enforcement, the intelligence community and the American people, with the unenviable challenge we face today: managing the consequences of a failed immigration system. To continue forward, to build upon the existing foundation, is akin to building a house on a cracked foundation—it is only a matter of time before the foundation shifts and the house falls.

## Rampant Internal Corruption

As the agency that hands out green cards, work permits, and citizenship, among other immigration benefits, the temptations for employees of USCIS to commit crime are constant. USCIS employees work in an atmosphere that permits—and often encourages—the waiving of rules. It is only a small step from granting a discretionary waiver of an eligibility rule to asking for a favor or a taking a bribe in exchange for granting that waiver. Once an employee learns he can get away with low-level corruption and still advance up the ranks, he or she becomes more brazen. The culture of corruption that permeated the old INS transferred intact to USCIS. This environment presents an easy target of opportunity for criminals, terrorists, and foreign intelligence operatives to ply their trade.

When I first briefed this Subcommittee on September 29, 2005, the Office of Security and Investigations had a backlog of 2,771 complaints against USCIS employees. The complaints alleged everything from overdue benefits and misuse of government property to bribery, undue influence of foreign governments, and espionage. Of the total backlog, 528 alleged

---

[3] *Immigration Benefits: Additional Controls and a Sanctions Strategy Could Enhance DHS's Ability to Control Benefits Fraud*, Government Accountability Office, March 2006, p. 16.

criminal violations. Included among these were national security cases, such as allegations that USCIS employees had provided material support to known terrorists or that they were being influenced by foreign intelligence services. Complaints with clear national security implications represented a small share of the total, but with these cases, even one is too many.

Allegedly corrupt employees ranged from mail clerks to top-level managers at headquarters and senior personnel in the field and overseas. Despite the fact that I had set aside money from OSI's budget to purchase a case management system to track these complaints, I was told that I could not purchase one, so we had no way to track our caseload or conduct link analyses. We had no way to investigate more than a small handful of criminal allegations since I was only permitted to hire six criminal investigators, despite the fact that I had been authorized in writing to hire 30. Since two of the six were assistant directors at OSI headquarters, I had a grand total of four investigators in the field.

Today, almost a year later, the backlog of misconduct complaints against USCIS employees is well over 3,000. This number does not include some 500 complaints that disappeared after Chief of Staff Paar and Deputy Director Divine took possession of all the complaints last winter and failed to return the same number they took.

Importantly this number also no longer includes service complaints (i.e., overdue immigration benefits), which are now separated and forwarded to the appropriate offices as they arrive. The total number of complaints, as well as the number that allege criminal violations, are unknown since OSI still has no case management system. New complaints are still coming in at a rate of around 50 per week, as was true when I was director. OSI still has a grand total of four criminal investigators in the field to handle all complaints. The two career special agents I had assigned to investigate espionage and terrorism-related allegations resigned in disgust, with one citing his desire to leave DHS to go "fight the war on terrorism."

While there are still multiple ongoing national security investigations and investigations against high-ranking USCIS personnel, there have been three high-profile arrests of USCIS employees in the past several months, along with one conviction.

- March 21, 2006— Eddie Romualdo Miranda, a USCIS adjudicator in Santa Ana, California, was arrested by local police on charges of attempted oral copulation and sexual battery under color of law for demanding sexual favors from a naturalization applicant in exchange for approving her application;

- March 22, 2006—Lisa Ann Gross, a contract employee of USCIS, was convicted of providing confidential law enforcement information to the target of a drug investigation after she gained unauthorized access to The Enforcement Communications System (TECS). This case represents the first criminal conviction in a case opened and investigated by OSI;

- June 7, 2006—Phillip A. Browne, a USCIS adjudicator in New York City, was arrested with his sister and 28 others and charged with arranging sham marriages, producing

      fake documents, selling one million dollars worth of green cards, and laundering the proceeds over a period of more than four years. The FBI, ICE, and the DHS Office of the Inspector General (OIG) conducted the investigation and made the arrests.

- June 29, 2006—the FBI, arrested Robert T. Schofield, a former Deputy District Director in the Washington field office of USCIS, after a joint investigation with the OIG, for falsifying naturalization certificates for Asian immigrants. Allegations against Schofield for misconduct, including accepting bribes, unauthorized use of government credit cards, and falsifying immigration documents, date back at least 10 years. Arrested with Mr. Schofield was a Chinese national, Qiming Ye, referred to by authorities as an "immigration broker" for Chinese seeking immigration status in the United States.

    I applaud the efforts of the local law enforcement officers and federal agents involved in the investigations listed above. Realistically, however, these cases represent the tip of the iceberg and numerous arrests should be forthcoming. At the time of my resignation as Director of OSI, the backlog of complaints included nearly 100 bribery allegations. Those allegations—which in March were intentionally under-reported by more than half to the DHS OIG by USCIS senior management—remain untouched, as do allegations of extortion, harboring illegal aliens, and structuring. Substantiated instances of foreign government influence and potential national security breeches by employees also have yet to be addressed, despite repeated warnings.

    Yet USCIS still refuses to aggressively support the new Director of OSI and his staff with either a reasonable budget or a rational policy. As long as OSI remains woefully under funded, understaffed, and prohibited by management from carrying out its mission, rampant corruption will continue.

    I warned both Chief of Staff Paar and then-Acting Deputy Director Divine on September 5, September 29, and October 5, 2005, that the lack of an Internal Audit Department at USCIS, capable of rooting out anomalies in the work product of supervisory immigration officers, presents a compelling national security threat. These warnings fell on deaf ears. In fact, I was ordered by both not to have direct contact or participate with the Joint Terrorism Task Force or the Intelligence Community.

    USCIS staff at Headquarters continues to insist that sufficient safeguards are built into the system to prevent immigration officers from granting benefits to the wrong people for the wrong reasons. The recent arrests, along with the case of the Iraqi Asylum Officer that appeared in the Washington Times in April, belie their claims.[4] Consider the extent to which one immigration officer could compromise national security over the course of a thirty year career by granting immigration benefits at the behest of enemies of the state. When the nexus between foreign intelligence services and state sponsors of terrorism, such as Iran, is factored in with the lack of internal checks and balances at USCIS, and the temptations employees face,

---

[4] Attachment 3: Dinan, Stephen, "Iraq spy suspect oversaw U.S. asylum," Washington Times, April 6, 2007.

the result is a recipe for disaster—a disaster not in the making, but already upon us. At the time of my resignation, OSI had initiated more than ten national security preliminary inquires involving employees. Instead of monitoring the email of suspected corrupt employees, however, USCIS senior management is monitoring the email of potential whistleblowers and my own.

Only when employees face a serious risk of detection and prosecution will they begin to think twice about violating the law. In the meantime, the Senate bill represents new opportunities for corrupt employees and our adversaries. It would create a huge new pool of aliens willing to pay bribes or perform sexual favors in exchange for immigration benefits. Moreover, we know that both foreign intelligence service personnel and terrorists closely study our immigration system, the agencies that administer that system, and its personnel. Once the agency was thoroughly overwhelmed by its additional workload under S. 2611, the chance of detecting foreign intelligence service personnel or their proxies would be completely lost.

## Overriding Customer-Service Mentality

USCIS is suffering from an identity crisis brought on by years of mismanagement and unwittingly encouraged by Congress. The central mission of USCIS is to execute the immigration laws enacted by Congress and to ensure that only those aliens who are eligible and who do not pose a risk to the United States or its residents are able to obtain permission to remain here. However, the agency sees itself as a "relocation facilitator" whose business is to serve aliens—the "customers"—wishing to reside here. The fact that the "customer" may be a violent criminal intending to victimize innocent Americans or a terrorist or spy intent on the destruction of the country is viewed as an acceptable risk. Historically, USCIS field offices have operated as fiefdoms and viewed headquarters as a necessary evil, worthy of lip service, but incapable of getting the job done. When policies were slow coming from inside the beltway, politically powerful Regional or District Directors would often implement their own policies and develop their own programs.

Despite vehement claims to the contrary by political appointees, USCIS is operating an immigration system designed not to aggressively deter or detect fraud, but first and foremost to approve applications. The desire to eliminate the backlog of benefit applications is so strong, for example, that USCIS management has redefined it at least three times in order to knock millions of pending applications off the list, including more than 235,000 that are awaiting an FBI name check.

USCIS senior leadership is much more concerned with reducing the backlog than with the integrity of the process. At one point, OSI opened a preliminary inquiry into allegations that over one million biometric files had disappeared from USCIS. Not long after we began investigating, we were assured that the biometrics had been found, though no one could quite explain what had happened. In another instance, allegations received by my office suggested that, since benefit applications are not counted toward the backlog until they are data entered,